**Yves Gautier EDIMO–DOUALLA, Petitioner,**

**v.**

Alberto R. GONZALES,[1] Respondent.

Docket No. 04–3638–AG.

United States Court of Appeals,
Second Circuit.

Submitted: June 8, 2006.

Decided: Sept. 19, 2006.

facts tending to give rise to probable cause to believe that Porat had committed trespass."

1. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as the respondent in this case.

278

Mark T. Kenmore, Buffalo, NY, for Petitioner.

Gregory R. Miller, United States Attorney for the Northern District of Florida; E. Bryan Wilson, Assistant United States Attorney, Tallahassee, FL, for Respondent.

Before: STRAUB, SOTOMAYOR, and HALL, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Yves Gautier Edimo–Doualla petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the decision of Immigration Judge ("IJ") Michael Rocco that denied his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158 and 1231, respectively, and for relief pursuant to the Convention Against Torture ("CAT") [2] and its implementing regulations, 8 C.F.R. § 208.16. *In re Yves Gautier Edimo–Doualla,* No. A 78 383 640 (B.I.A. Jun. 1, 2004), *aff'g* No. 78 383 640 (Immig. Ct. Buffalo Nov. 25, 2002). We vacate and remand because the IJ erred in a number of respects, including failing to take account of testimony showing that the harm Edimo–Doualla suffered was on account of political opinion; misapplying BIA and Second Circuit precedent regarding the meaning of the statutory term "persecution"; requiring physical evidence of the abuse Edimo–Doualla claimed to have suffered without explaining why he believed such evidence was reasonably available; and discounting portions of Edimo–Doualla's testimony because of Edimo–Doualla's use of false identification documents without explaining what weight he assigned to this factor and without distinguishing between the use of false documents to flee persecution and to attempt to enter the United States illegally.

## BACKGROUND

Edimo–Doualla is a native and citizen of Cameroon. In 2000, he attempted to enter the United States illegally, through Canada, but was apprehended and detained at the border. He filed an application for asylum, withholding of removal and relief under the CAT, in which he stated that he feared returning to Cameroon because he had been persecuted there on account of his political opinion. He claimed to have

---

**2.** United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85.

suffered persecution because of his involvement with the Social Democratic Front of Cameroon ("SDF"), a leading political opposition party. At his hearing, Edimo–Doualla testified to having been detained and beaten by Cameroonian authorities on multiple occasions. Specifically, he described the following incidents in his testimony.

In January 1991, Edimo–Doualla was arrested and detained for one day because of his participation in a demonstration against the government's arrest of a prominent Cameroonian writer. In November 1991, he was arrested for protesting against a government-imposed curfew and was beaten repeatedly with a cane on the soles of his feet. In 1996, he was again arrested, this time during a student demonstration, and was held for two days.

In 1997, Edimo–Doualla was arrested at gunpoint by the Cameroonian secret police and detained for between three and five days after they caught him distributing political flyers. The police told him that he had been arrested because he was "in violation of the security of the state." Edimo–Doualla was taken to the police station, where the police handcuffed him, chained his legs and beat him on the soles of his feet with the flat side of a machete for about four hours. Every half hour or so, the police stopped beating him and made him jump on gravel in the yard outside the police station while singing songs in praise of Paul Biya, the president of Cameroon. He was beaten multiple times during his detention and deprived of food and water.

After his release, Edimo–Doualla borrowed a cousin's French passport and fled to Canada. Once in Canada, he went directly from the airport to an immigration office, where he applied for refugee status

using his real name. While he was in Canada, his brother was detained for several weeks by Cameroonian authorities. Shortly after his release, Edimo–Doualla's brother died after developing abdominal pains.[3] Edimo–Doualla's application for refugee status was eventually denied, and he was ordered to leave Canada. He left on January 15, 2000, and returned to Cameroon, where he attended his brother's funeral.

When Edimo–Doualla arrived at the airport in Cameroon, he was asked by a police officer what he had been doing in Canada. He admitted that he had applied for refugee status there. The police officer accused him of "dirty[ing] our name, giv[ing Cameroon] a bad reputation," and took him to a room where he was held for about forty-five minutes and forced to sign a document that he was not allowed to read and that he later learned was a warrant for his own arrest. A police officer told him not to continue his political activities. The police confiscated his passport, but did not detain him further at that time.

In the weeks following his return to Cameroon, the police came to his home at least twice looking for him and left him summons forms ordering him to appear at the police station. They also broke down the door to his room and took books, papers and magazines addressing political subjects. At this point, Edimo–Doualla effectively went into hiding, staying away from his home. In April 2000, however, he attended a political meeting, and when he left, he and another political activist, Samuel Etouke, were arrested.

The police took Edimo–Doualla and Etouke to the police station. The station compound had a high bar suspended on two pillars. The officers made Etouke, who at this point was naked, climb onto a

---

**3.** Edimo–Doualla did not testify regarding the cause of his brother's death.

bench so that his arms were level with the bar. They then cuffed his arms to the bar and removed the bench so that he was suspended in mid-air by his arms. While he was in this position, the officers beat him on the back and buttocks with a wire and rubber instrument for ten to fifteen minutes. The officers then turned to Edimo–Doualla, who also was naked, and did the same. For about two hours, they took turns beating Edimo–Doualla and Etouke in this position. Afterwards, the officers locked them in a cell, in only their underwear, with no food or water. The police kept Edimo–Doualla and Etouke in this cell for five or six days and beat them each day in the same manner. Edimo–Doualla was taken to the police commissioner, who said that he had recommended that the officers continue to beat Edimo–Doualla and that Edimo–Doualla "was going to spend a few years in jail."

After five or six days, the police transferred Edimo–Doualla to the New Bell central prison. Etouke was sent to a hospital with a broken arm and untreated diabetes, and he died there. On Edimo–Doualla's first day at New Bell, he was given a bucket of water mixed with urine and told to shower with it. Otherwise, Edimo–Doualla was not mistreated during his three months in prison. He was released after his mother bribed a prison guard.

Once released, he traveled to Nigeria, and then to Canada, using another person's French passport. (After arriving in Canada, he sent the French passport back to "the person who helped me with it.")

He then stole and used a Canadian identification card to attempt to enter the United States, where he planned to apply for asylum, but American border officials recognized his documents as fraudulent and detained him. Edimo–Doualla testified that he used the stolen documents, rather than simply asking for asylum at the border, because he was unaware of how the asylum process worked in the United States. In August 2000, he pled guilty to a charge of "attempt[ing] to enter ... the United States by a willfully false or misleading representation or the willful concealment of a material fact." 8 U.S.C. § 1325(a)(3).

While in detention, Edimo–Doualla applied for asylum, withholding of removal and CAT relief, claiming that he had suffered persecution on account of political opinion. In support of his application, Edimo–Doualla submitted proof of his identity and nationality, SDF membership cards dating back to 1992, the police summons forms issued before his most recent arrest and letters from his wife and mother corroborating his story. On November 25, 2002, after a removal hearing, the IJ denied Edimo–Doualla's application because he concluded that the evidence Edimo–Doualla had submitted was insufficient "to compel a finding" that he had been persecuted on account of his political opinion.[4]

The IJ offered a number of reasons for this conclusion. As to the two 1991 arrests and the 1996 arrest, the IJ found that (1) there was no evidence that the arrests were "motivated by a desire to punish the Respondent on account of polit-

---

4. We note, with some concern, the IJ's repeated citation to a "compelling evidence" standard. This, of course, is the exceedingly high standard for *courts of appeals* to apply in deciding whether to take the rare step of reversing (rather than merely vacating) an IJ's factual findings. *See Zhi Wei Pang v. Bureau of Citizenship and Immigration Servs.*, 448 F.3d 102, 107 (2d Cir.2006). It is not the standard IJs should apply to an applicant's evidence in making such findings in the first instance. *See* 8 C.F.R. § 208.13 (defining the burden of proof for establishing eligibility for asylum). The IJ's language constitutes legal error and imposes a greater burden on petitioners than the law requires.

ical beliefs," and (2) Edimo–Doualla had "offered no evidence of permanent or serious injury amounting to persecution." Regarding the 1997 arrest and beating, the IJ found that (1) there was no evidence that the Cameroonian authorities were aware of Edimo–Doualla's political views when they arrested him or that they questioned him about his views during his detention, and (2) Edimo–Doualla had failed to "proffer ... physical evidence of abuse consistent with the alleged mistreatment or other evidence of medical treatment for alleged injuries." Moreover, the IJ noted the following "other facts" that "undercut" Edimo–Doualla's claim: (1) Cameroonian authorities had not searched for Edimo–Doualla while he was in Canada; (2) Edimo–Doualla's mother and sister had not been threatened or harmed because of him; and (3) his testimony regarding his brother's death did not compel the conclusion that "his brother was killed as claimed or that any political opinions held by him were attributed to" Edimo–Doualla. Finally, as to the April 2000 incident, the IJ concluded that Edimo–Doualla had not established political persecution because his credibility was undermined by (1) the fact that Cameroonian authorities summoned him for a prosecutorial purpose, not to persecute him for his political opinion, and only arrested him when he failed to appear, and (2) Edimo–Doualla's "dishonesty and untruthfulness" and his use of fraudulent documents.

On June 1, 2004, the BIA affirmed the IJ's decision without opinion pursuant to 8 C.F.R. § 1003.1(e)(4) and Edimo–Doualla filed this timely petition for review.

## DISCUSSION

To establish eligibility for asylum, which is available at the Attorney General's discretion, an applicant must establish that he or she is "unwilling or unable" to return to his or her native country because of past persecution or a well-founded fear of future persecution on account of one of five protected grounds: race, religion, nationality, membership in a particular social group or political opinion. 8 U.S.C. § 1101(a)(42); *see Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004). Persecution is "the infliction of suffering or harm upon those who differ on the basis of a protected statutory ground"; it "encompasses a variety of forms of adverse treatment, including non-life[-]threatening violence and physical abuse," but does not include "mere harassment." *Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 341 (2d Cir.2006) (internal quotation marks omitted). Unlike asylum, withholding of removal under the INA is nondiscretionary, and to establish eligibility an applicant must make the more stringent showing that his or her "life or freedom" would more likely than not be threatened on account of a protected ground if he or she were removed. 8 U.S.C. § 1231(b)(3)(A); *see Ramsameachire*, 357 F.3d at 178. To obtain withholding of removal under the CAT, an applicant must show that it is more likely than not that he or she would be tortured if removed. 8 C.F.R. § 208.16.

Where, as here, the BIA summarily adopts or affirms an IJ's decision without opinion, we review the IJ's decision directly. *See Twum v. INS*, 411 F.3d 54, 58 (2d. Cir.2005). We review *de novo* IJs' findings concerning the legal sufficiency of the evidence, as they present questions regarding the application of law to fact. *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003). Moreover, "using an inappropriately stringent standard when evaluating an applicant's testimony constitutes *legal*, not factual error, and we review de novo whether such a standard has been used." *Cao He Lin v. U.S. Dep't of Jus-*

*tice,* 428 F.3d 391, 400 (2d Cir.2005) (quoting *Secaida–Rosales,* 331 F.3d at 307 (citation omitted) (emphasis in original)). We review IJs' factual findings, however, under the substantial evidence standard, sustaining all findings that are "supported by 'reasonable, substantial, and probative' evidence in the record when considered as a whole." *Secaida–Rosales,* 331 F.3d at 307 (quoting *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000)); *see* 8 U.S.C. § 1252(b)(4)(B) (providing that administrative findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

Despite errors in an IJ's decision, we will not remand if it would be futile to do so. *Xiao Ji Chen v. U.S. Dep't of Justice,* 434 F.3d 144, 161 (2d Cir.2006). Remand would be futile if we can " 'confidently predict' that the IJ would reach the same decision absent the errors that were made." *Id.* at 162 (quoting *Cao He Lin,* 428 F.3d at 395). That is, "to deny review in the face of . . . errors, a court must have confidence that an error-free proceeding would yield the same result." *See Li Zu Guan v. INS,* 453 F.3d 129, 138 (2d Cir. 2006).

Here, the IJ rejected Edimo–Doualla's claim of political persecution. He never made a specific adverse credibility determination. Instead, from what we can discern, the IJ appears to have analyzed in turn the various incidents of abuse to which Edimo–Doualla testified and concluded, on different grounds, that the 1991 and 1996 arrests; the 1997 arrest, detention and beating; and the April 2000 arrest, detention and beating did not constitute political persecution. This opinion tracks the organization of the IJ's decision. We find that the IJ's reasoning as to each incident of alleged persecution was flawed in multiple respects. Because we cannot confidently predict that the IJ would reach

the same result absent these errors, we remand to the BIA.

## I. The 1991 and 1996 Arrests

The IJ appears to have accepted as true Edimo–Doualla's testimony regarding the 1991 and 1996 arrests. He concluded, however, that Edimo–Doualla had not demonstrated a connection between these incidents and his political views and that in any event the harm Edimo–Doualla claimed to have suffered did not rise to the level of persecution. As a finding of fact, we review the first conclusion for substantial evidence. *Secaida–Rosales,* 331 F.3d at 307. We review the second conclusion, which involves the application of a legal standard to established facts, *de novo. Id.* We address these conclusions in turn.

### A. Whether the Harm Was on Account of Political Opinion

■ Edimo–Doualla's testimony regarding the 1991 and 1996 arrests clearly indicates a connection between his political activities and his mistreatment at the hands of Cameroonian authorities. As to the first 1991 incident, Edimo–Doualla testified that he was arrested because he was participating in a demonstration against the arrest of a prominent writer. As to the second 1991 incident, he claimed he was arrested for demonstrating against a government-imposed curfew. Regarding the 1996 incident, he testified that he was arrested during a student demonstration. Edimo–Doualla thus testified that his mistreatment in each instance was the direct result of his political activities. The IJ's conclusion that Edimo–Doualla had failed to show that the arrests bore any connection to his political views fails entirely to take account of Edimo–Doualla's testimony and therefore is not supported by substantial evidence. *See Ivanishvili,* 433 F.3d at 341–42 ("[I]n the face of the substantial

testimony and corroborating documentation petitioner submitted to the IJ regarding her ... persecution, we find it remarkable, not to mention frustrative of judicial review, that the IJ did not in any way analyze or weigh that testimony.").

### B. Whether the Alleged Harm Amounted to Persecution

 The IJ also found that the 1991 and 1996 arrests and detentions did not rise to the level of persecution. In reaching this conclusion, the IJ stated that "on the occasion [Edimo–Doualla] allegedly was mistreated he offered no evidence of permanent or serious injury amounting to persecution." We review *de novo* whether the IJ applied the correct legal standard for persecution claims, *see Secaida–Rosales*, 331 F.3d at 307, and conclude that the IJ erred. The BIA does not require an applicant claiming persecution to demonstrate "permanent or serious injury." *See In re O–Z & I–Z–*, 22 I. & N. Dec. 23, 25–26 (BIA 1998) (finding that the applicant had suffered persecution, even though he had not suffered any permanent or serious injuries, where he was physically attacked three times, his apartment was broken into and his possessions destroyed and stolen, he received threatening fliers and his son was beaten at school and forced to undress in front of classmates). "We have explained that persecution ... encompasses a variety of forms of adverse treatment, including non-life[-]threatening violence and physical abuse or non-physical forms of harm." *Ivanishvili*, 433 F.3d at 341 (internal quotation marks and citations omitted) (alteration in original). We have further stated that evidence of "physical abuse and violence at the hands of government agents or private actors who behave with impunity in the face of gov-

ernment reluctance to intervene .... [,] if credible, may preclude a finding that the conduct is mere harassment that does not as a matter of law rise to the level of persecution, for violent conduct generally goes beyond the mere annoyance and distress that characterize harassment." *Ivanishvili*, 433 F.3d at 342. Thus, the IJ's apparent requirement that Edimo–Doualla show "permanent or serious injury" was in error.

There was an additional fundamental error in the IJ's analysis. In assessing the question of whether Edimo–Doualla's mistreatment amounted to persecution, the IJ considered the 1991 and 1996 incidents separately from the 1997 and 2000 incidents. Incidents alleged to constitute persecution, however, must be considered cumulatively. *See Poradisova v. Gonzales*, 420 F.3d 70, 79–80 (2d Cir.2005) (holding that an IJ must consider events cumulatively to determine whether past persecution has occurred); *In re O–Z & I–Z–*, 22 I. & N. Dec. at 25–26 (same). A series of incidents of mistreatment may together rise to the level of persecution even if each incident taken alone does not.

In this case, Edimo–Doualla alleged mistreatment including: four beatings during a 1991 arrest; a two-day arrest in 1996; multiple beatings and other forms of abuse during a three-to-five-day arrest in 1997; a brief detention at the airport in 2000 during which he was forced to sign an arrest warrant without being allowed to read it; a break-in in which his property was seized; multiple beatings in 2000 during each of six days that Edimo–Doualla was held at a police station; and a three-month prison term that began with his being forced to bathe with a bucket of water mixed with urine.[5] On remand, the

---

5. As we discuss below, the IJ may have determined that Edimo–Doualla's testimony regarding the April 2000 incident was not credible. Even without this incident, however, we

IJ should assess whether these incidents, taken together, constitute persecution under BIA precedent. Because remand is required by the IJ's application of an erroneous legal standard and his failure to consider cumulatively Edimo–Doualla's allegations, we do not reach the question of whether we would sustain a finding that these incidents, if believed, did not constitute persecution.

## II. The 1997 Arrest, Detention and Beating

■ The IJ found Edimo–Doualla's testimony regarding his 1997 arrest, detention and beating "equally unconvincing to compel a finding of eligibility for asylum" because Edimo–Doualla had failed to show any connection between the mistreatment and his political views and because he had not proffered physical evidence in support of his claim. Both of these bases are erroneous because they fail adequately to account for Edimo–Doualla's testimony and rest on the IJ's impermissible speculation.

The IJ concluded that Edimo–Doualla had offered only a "vague and speculative statement that the authorities were aware of his anti-government views" and "offered little evidence to elaborate on the basis of his detention or the substance of any questioning." As with his treatment of the earlier incidents, the IJ provided only this conclusory statement to explain why he thought Edimo–Doualla's testimony did not establish a connection between his political opinion and the mistreatment he suffered. In recounting the facts of the case, the IJ himself noted that Edimo–Doualla "was arrested by security personnel while distributing leaflets announcing [an] opposition boycott of the elections because of

voting irregularities." Edimo–Doualla testified that he was told during his detention that he was "in violation of the security of the state" and was made to sing songs in praise of the president. This testimony draws a direct connection between the alleged mistreatment and Edimo–Doualla's political activity.

The IJ also stated that Edimo–Doualla had not presented evidence that "the authorities ever questioned him about or even knew of his claimed political activities or opinions." Edimo–Doualla's testimony makes clear, however, that he was arrested in connection with the distribution of political leaflets, which belies the IJ's statement that the evidence does not show that the authorities were aware of Edimo–Doualla's political views. Moreover, the IJ's assumption that the authorities would have interrogated Edimo–Doualla about his political beliefs is speculative; the IJ offered no basis for believing that the authorities arrested Edimo–Doualla because they sought information. The IJ's conclusion thus reflects both a failure to "analyze or weigh" Edimo–Doualla's testimony adequately, see *Ivanishvili*, 433 F.3d at 341–42, and impermissible speculation, see *Secaida–Rosales*, 331 F.3d at 307 (noting that factual findings based on flawed reasoning do not satisfy the substantial evidence standard).

■ The IJ also faulted Edimo–Doualla for failing to provide either corroborating documentation in the form of "physical evidence of abuse consistent with the alleged mistreatment or other evidence of medical treatment for alleged injuries." The IJ apparently believed that the injuries Edimo–Doualla suffered as a result of being detained and beaten on the soles of

cannot say with confidence that the IJ would have reached the same decision had he considered together the harms Edimo–Doualla

described in the 1991, 1996 and 1997 incidents.

his feet would have left physical scars or required medical treatment. For the following reasons, the IJ's implicit conclusion is not supported by substantial evidence.

We have held that "[a]n applicant may be required to provide any reasonably available documentation to corroborate the elements of her claim, or explain why such documentation is unavailable, and an IJ may rely on the failure to do so in finding that the applicant has not met her burden of proof." *Kyaw Zwar Tun v. INS*, 445 F.3d 554, 563 (2d Cir.2006). We review an IJ's finding that corroborative evidence was reasonably available under the substantial evidence standard, reversing only where "a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4)(B). We may remand where the IJ has not relied on substantial evidence in the record in finding that documentation was reasonably available. *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 153 (2d Cir.2003); *see Kyaw Zwar Tun*, 445 F.3d at 563.

As to Edimo–Doualla's failure to provide "physical evidence" of abuse, the IJ never indicated why he believed that such evidence—presumably scarring on his feet—would be available. Edimo–Doualla did not testify that he had scars from the incident, nor did his testimony suggest it. Rather, he testified that his feet were "swollen" after the beatings, which does not clearly indicate that he would retain scars after the fact. In the absence of some evidence suggesting that Edimo–Doualla would have had scars if he had been mistreated as he claimed, the IJ erred in faulting Edimo–Doualla for failing to present physical evidence of abuse.[6]

Indeed, courts have realized that some persecutors may *deliberately* choose a form of abuse that is painful and terrifying but does not leave physical manifestations. *Durgac v. Gonzales*, 430 F.3d 849, 853 (7th Cir.2005) (noting human rights reports that Turkish security officials deliberately avoid leaving scars); *Abdulrahman v. Ashcroft*, 330 F.3d 587, 600 (3d Cir.2003) (unanimous concurring opinion) (stating that the panel could "easily conceive of beating that [by design] do not leave scars"). The methods of abuse described by Edimo–Doualla—beating on the immobilized soles of the feet with a machete, interspersed with injunctions to jump around on gravel, and beating while the victim is suspended by the wrists from a pole—could fit this pattern. It was speculative for the IJ to assume that scars were necessary either to corroborate Edimo–Doualla's account or to establish a level of abuse amounting to persecution.

As to Edimo–Doualla's failure to provide medical records corroborating his account, the IJ seems to have assumed that Edimo–Doualla necessarily would have received medical treatment for his injuries. Edimo–Doualla specifically testified, however,

---

**6.** The record indicates that Edimo–Doualla may have been able to produce some evidence of abuse in the form of scars on his back from a skin ailment he developed while sleeping on the unsanitary floor during one of his periods of detention. Admittedly, it is unclear from Edimo–Doualla's testimony whether he received these scars during the 1997 detention. It is also unclear whether Edimo–Doualla continued to bear these scars at the time of the hearing. Given these ambiguities, however, the IJ should have explained why he disregarded this potential corroboration; although these scars, if Edimo–Doualla still had them, may not have corroborated his claims to have been beaten on the feet, they could have provided corroboration more generally of his mistreatment at the hands of Cameroonian authorities. Without such an explanation, it is unclear why the IJ never asked him to show the scars; they were unquestionably "reasonably available" evidence and could easily have been shown at the hearing. *Jin Shui Qiu*, 329 F.3d at 153.

that after the beating "I should have received some medical care, but I didn't receive any." To the extent that the IJ assumed that Edimo–Doualla would have sought medical attention after his release from custody, the IJ engaged in impermissible speculation. The IJ's implicit finding that evidence of medical treatment was reasonably available therefore is not supported by substantial evidence. For this reason and the others discussed, the IJ's conclusion that the 1997 incident did not constitute political persecution is erroneous.

### III. Other Facts Undercutting Edimo–Doualla's Claim

The IJ concluded that "other facts in the record undercut [Edimo–Doualla's] claim of persecution." Although this part of the IJ's decision immediately follows his treatment of the 1997 incident, its relationship to that previous discussion is unclear. The IJ may have believed that these "other facts" undermined Edimo–Doualla's claim of persecution only with regard to the 1997 incident, or he may have thought that they undermined Edimo–Doualla's claim more generally. Given this uncertainty, we treat this aspect of the IJ's decision separately from the 1997 incident. Regardless of the significance the IJ attached to these other facts, they reflect impermissible speculation and a misunderstanding of the record, and it was error for the IJ to rely on them.

These "other facts" were (1) the lack of evidence that the Cameroonian authorities searched for Edimo–Doualla in Cameroon while he was in Canada, (2) the fact that Edimo–Doualla's wife and mother had not been threatened or harmed by Cameroonian authorities because of Edimo–Doualla's political activities, and (3) that Edimo–Doualla had not presented convincing evidence regarding the cause of his brother's

death or that he was persecuted because of his brother's political views. It is unclear from the IJ's decision what relevance he assigned to these "other facts"; the entire discussion could have borne on Edimo–Doualla's credibility or could have represented a determination that Edimo–Doualla's objective risk of future persecution is not significant. We consider these other facts in turn.

First, as to the IJ's observation that Cameroonian authorities did not look for Edimo–Doualla while he was in Canada or after his last departure from Cameroon, Edimo–Doualla's testimony shows that he was mistreated by government authorities in each instance closely following his participation in political activities. Nothing in the record shows that the authorities ever looked for him except in response to such activities. It was therefore speculative to attach any significance to the authorities' inaction while Edimo–Doualla was out of the country and, necessarily, not engaged in political activities.

Second, although it is true that there is no evidence that either Edimo–Doualla's mother or his wife have been harmed or threatened because of his political activities, the IJ failed to consider that, according to Edimo–Doualla's testimony, they were two members of his family who were not politically active. It is unclear why the IJ believed that they *would* be persecuted. Moreover, Edimo–Doualla testified only that they were unmolested by Cameroonian authorities "these days," which appears to refer to a period during which Edimo–Doualla was out of the country. Insofar as the IJ believed that Edimo–Doualla's mother or his wife would have been persecuted because of his political opinion, either while he was in the country or after he fled, this conclusion was speculative.

Finally, the IJ stated that the "evidence presented concerning actions taken against

[Edimo–Doualla's] brother is conclusory, speculative, lacking in detail and insufficient to compel a conclusion that his brother was killed as claimed or that any political opinions held by him were attributed to [Edimo–Doualla]." Edimo–Doualla, however, never claimed that his brother was killed for his political activities; in fact, he acknowledged not knowing why his brother had been arrested and did not express an opinion as to what caused his brother's death.[7] Nor did he testify that he was mistreated because of his brother's political views. Thus, it was error for the IJ to conclude that Edimo–Doualla's testimony regarding his brother's death "undercut" his claim of persecution.

In short, none of the "other facts" cited by the IJ undermined Edimo–Doualla's claim of persecution, whatever the IJ intended their relevance to be.

## IV. The April 2000 Arrest, Detention and Beatings

■ Finally, the IJ concluded that he was "not convinced" that Edimo–Doualla's testimony regarding the April 2000 incident established political persecution. The IJ's conclusion seems to have been based on two findings. First, the IJ concluded that the circumstances of Edimo–Doualla's arrest indicate that the authorities' purpose was "prosecutorial" rather than persecutory. The IJ noted that the summons forms left for Edimo–Doualla when the authorities visited his home prior to his arrest order the person summoned to "report ... for a matter concerning him, holding an identification document." The

IJ appears to have interpreted this language to mean that Edimo–Doualla was summoned due to a question about his identification documents. The IJ never considered whether this language indicated that the person summoned should bring identification when reporting to the police regarding some unspecified matter. If our understanding of the IJ's reasoning is accurate, he erred in concluding that the summons undermined Edimo–Doualla's claim of political persecution. *See Secaida-Rosales,* 331 F.3d at 307. Even if the IJ read the summons correctly as pertaining to a nonpolitical, "prosecutorial" matter, however, it would be impermissibly speculative to conclude that a government would summon a political dissident with forms that indicate an intent to persecute on the basis of political opinion.

Edimo–Doualla's testimony, if believed, indicated that the April 2000 incident was politically motivated. He testified that the authorities sought him after learning that he had applied for refugee status in Canada, seized political documents from his home and arrested him immediately after a political meeting. The IJ failed to "weigh and analyze" this evidence. *See Ivanishvili,* 433 F.3d at 341–42. His finding that the April 2000 arrest did not support Edimo–Doualla's claim of political persecution is therefore not based on substantial evidence.

Second, the IJ also concluded that Edimo–Doualla's credibility was undermined by his "dishonesty and untruthfulness, his presentation of fraudulent documents and

---

**7.** Edimo–Doualla's asylum application mentions his brother's arrest, but only in response to the question on that form asking whether any family members had ever been arrested. His response did not suggest a political motive for the arrest. The addendum does indicate that his brother was politically active, and that he "mysteriously died after having

been released from prison," but Edimo–Doualla never claimed to know the answer to that mystery. The IJ's refusal to conclude that Edimo–Doualla's brother was killed for political reasons was appropriate, but it was error to weigh this as a factor against Edimo–Doualla's claims.

the apparent stated basis of the government's inquiry." The third of these considerations, as just discussed, may reflect a misunderstanding of the meaning of the summons forms. As to the first two grounds, however, it is unclear exactly what the IJ meant and on what evidence he relied. In particular, we cannot determine whether the IJ relied on Edimo–Doualla's federal conviction for attempting to enter the country using false documents, his underlying use of false entry documents or his use of false documents to leave Cameroon in 1997 or 2000.

Edimo–Doualla used false documents both to exit Cameroon and to attempt to enter the United States from Canada. We have held that the use of fraudulent documents "to escape immediate danger or imminent persecution" cannot itself form the basis of an adverse credibility determination because a "reasonable person facing [persecution] may offer false documents to escape it." *Rui Ying Lin v. Gonzales,* 445 F.3d 127, 133 (2d Cir.2006). Thus, for the IJ to have based an adverse credibility finding on Edimo–Doualla's use of false documents to exit Cameroon, he would have had to undertake a *Rui Ying Lin* analysis and found that when Edimo–Doualla used these documents he was not in the process of escaping "immediate danger or imminent persecution." If the IJ relied on this use of false documents, his failure

to apply the *Rui Ying Lin* would therefore be error.

Moreover, in discussing factors to consider in determining whether a discretionary grant of asylum is appropriate, the BIA has held that "the use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor while, at the other extreme, entry under the assumed identity of a United States citizen with a United States passport, which was fraudulently obtained by the alien from the United States government[,] is very serious fraud." *Matter of Pula,* 19 I. & N. Dec. 467, 474 (BIA 1987). We otherwise lack BIA guidance regarding the use of false documents to enter the United States. If the IJ here relied on either Edimo–Doualla's use of false documents to enter the United States or his conviction for that crime, we are unable to determine what legal standards he applied and what weight he assigned to these considerations.[8] In light of this uncertainty, we cannot review the IJ's reasoning, and remand is appropriate.

## CONCLUSION

For the foregoing reasons, we GRANT the petition for review, VACATE the BIA's decision, and REMAND for further proceedings consistent with this opinion.

---

8. We recognize that to the extent that the IJ and BIA consider Edimo–Doualla's conviction, they must do so in the context of the record "as a whole," including all the evidence Edimo–Doualla presented. *See Diallo v. Gonzales,* 445 F.3d 624, 629 (2d Cir.2006). The full record in this case includes Edimo–Doualla's detailed, consistent testimony during direct examination, intensive cross-examination by the government, and examination by the IJ; his demonstrated extensive knowledge of the political opposition in Cameroon; corroboration from his wife and mother;

documentary corroboration of his membership in a well-known dissident group, the SDF; and the police summons forms. Moreover, the country conditions evidence Edimo–Doualla submitted, including a report from the United States Department of State, describes violent government crackdowns on members of pro-democracy groups, including the SDF. Whatever weight may reasonably be given to Edimo–Doualla's fraud in assessing the credibility of his account, we assume that these factors will be part of the consideration the IJ and BIA render.