03-40052-ag(L)
Manzur v. DHS

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

- - - - - -

August Term, 2006

(Argued: January 26, 2007    Decided: July 13, 2007)

Docket Nos. 03-40052-ag(L), 03-40054-ag(con),
03-40056-ag(con), 03-40068-ag(con)

_____

RANA YASMEEN MANZUR, ZOHEB MANZUR,
SHAFQAT MUHAMMED MANZUR, and RUBANA MANZUR

Petitioners,

-v.-

U.S. DEPARTMENT OF HOMELAND SECURITY,

Respondent.

_____

Before:    KEARSE, SOTOMAYOR, Circuit Judges, and KOELTL, District
Judge.*

_____

On petition for review of a decision of the Board of Immigration Appeals summarily affirming the Immigration Judge's denial of the petitioners' applications for asylum and withholding of deportation pursuant to the Immigration and Nationality Act and withholding of deportation under the Convention Against Torture. Because the decision of the Immigration Judge is deficient in several significant respects, depriving the Court of the opportunity to conduct a meaningful judicial review, the petition for review is **GRANTED**. The decision of the BIA is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

WALTER H. RUEHLE, Legal Aid Society, Rochester, New York, for Petitioners.

JOHN C. TRUONG, Assistant United States Attorney, Washington, D.C. (Kenneth L.

_____

* The Honorable John G. Koeltl of the United States District Court for the Southern District of New York, sitting by designation.

1

Wainstein, United States Attorney for the District of Columbia, and Madelyn E. Johnson and Heather R. Phillips, Assistant United States Attorneys, Washington, D.C., on the brief), for Respondent.

**KOELTL, District Judge:**

Rana Yasmeen Manzur and three of her adult children, Zoheb Manzur, Shafqat Muhammed Manzur, and Rubana Manzur, all natives and citizens of Bangladesh, petition for review of the May 15, 2003 orders of the Board of Immigration Appeals ("BIA") affirming without opinion the January 31, 2002 decision of Immigration Judge ("IJ") Michael Rocco, denying the petitioners' applications for asylum and withholding of deportation (now "withholding of removal") pursuant to the Immigration and Nationality Act ("INA" or the "Act") and withholding of deportation under the Convention Against Torture ("CAT").[1] Because the IJ's analysis is deficient in several significant respects, depriving this Court of the opportunity to conduct a meaningful judicial review, we grant the petition, vacate, and remand.

---

[1] The procedure now referred to as "withholding of removal" was previously described as "withholding of deportation," the term used in the IJ's decision. See Tandia v. Gonzales, 437 F.3d 245, 247 n.5 (2d Cir. 2006).

**I.**

**A.**

The petitioners are the immediate family members of the late Major General Mohammad Abul Manzur, a former high-ranking official in the Bangladeshi military and a leading Bengali "freedom fighter" in the 1971 Bangladeshi war for independence from Pakistan. Rana Manzur, the lead petitioner, is General Manzur's widow, and co-petitioners Zoheb, Shafqat, and Rubana Manzur are three of the couple's four children.[2]

The last time Rana Manzur saw her husband, and the children their father, was in May 1981 when three military officers entered the Manzurs' home in the middle of the night and took General Manzur away. According to the petitioners, that incident marked the beginning of a pattern of persecution that lasted approximately twelve years, through 1993, around the time the last of the petitioners, Rana Manzur, finally left Bangladesh.

The following morning, after General Manzur was taken away, Rana Manzur and her four young children awoke to find the telephone disconnected and their normal security detail replaced by more than one hundred armed guards, acting under military command. Rana Manzur also learned that the night before, the same

---

[2] The fourth child, Karishma Manzur, had her applications for asylum and withholding of deportation under the Act, and withholding of deportation under the CAT, denied together with those of the rest of her family, but she was granted a suspension of deportation and thus is not a party to this petition for review.

night General Manzur was taken away, the Bangladeshi president, Ziaur Rahman (known as "Zia"), had been assassinated. When Rana Manzur tried to escape to find a telephone to call her husband, she was captured by the guards, returned to her home, and handcuffed. Her children were tied up. The guards then looted the house. Rana Manzur was handcuffed intermittently over the next several days as the family remained under house arrest.

About three days after their house arrest began, a Lieutenant Colonel Mohammed Abdul Awal, who was married to General Manzur's younger sister, came to visit Rana Manzur at her home. Colonel Awal was a "razakar," a Bengali officer formerly in the Pakistani army who fought against Bangladeshi independence in the 1971 war and against freedom fighters like General Manzur. Colonel Awal convinced Rana Manzur to leave her home and accompany him to Dhaka, where he told her General Manzur had been taken.

Escorted by Colonel Awal and armed guards, the family was transported by military helicopter to the capital city of Dhaka. Once there, the family was driven to a two-story house in a remote area. They never saw General Manzur. Instead, for the next month, the family was detained in that house, confined to a single room on the second floor. During that time, the family was under constant guard by armed men dressed in civilian attire. These men told Rana Manzur that they were with the "foreign service," but she suspected that they were with the Directorate of General

4

Forces Intelligence ("DGFI"), a government intelligence organization, then headed by a razakar. The guards refused to tell Rana Manzur why the family was being detained. After about a month, the family was released.

Once released, Rana Manzur learned that her husband, General Manzur, had been killed. According to the account provided by the Bangladeshi government, General Manzur was executed for his alleged role in a coup d'etat attempt that led to President Zia's assassination. In addition, thirteen other military officers, eleven of whom were freedom fighters, were eventually executed for their alleged involvement in the coup, including a nephew of General Manzur; for the same alleged reason, two hundred freedom fighters were dismissed from the army. Allegedly, Lieutenant General Hossain Mohammed Ershad, a razakar who was then head of the Bangladeshi army, ordered General Manzur's execution.

The petitioners contend--consistent with at least one account of the events surrounding the 1981 coup--that General Ershad fabricated General Manzur's involvement in the alleged coup and orchestrated the president's assassination as part of a high-level conspiracy designed simultaneously to eliminate the president, suppress political opposition from the freedom fighters, particularly General Manzur, and clear the path for General Ershad's eventual rise to power. In 1982, General Ershad seized control from Bangladesh's interim government in a bloodless,

military coup, imposed martial law, and, in 1983, declared himself president.

The petitioners allege that General Ershad was the driving force behind their persecution in Bangladesh, both before and after their release from detention. A friend in the military informed Rana Manzur that after the 1981 coup, General Ershad wanted to kill her and her children, but was talked out of the idea by other officers. Another friend, whose husband was in the military and privy to such information, informed Rana Manzur of a government report alleging that she was involved in antigovernment activity.

After the Manzurs' release from confinement, the family remained under constant surveillance, which lasted throughout their time in Bangladesh; they were followed frequently by what they perceived to be agents of the DGFI. For about six months after their release, the petitioners lived with various extended family members, but were forced to move frequently, in part because these family members were fearful of what they perceived to be a significant threat from ongoing government surveillance. At this time, the DGFI would come to the house where the petitioners were staying and ask personal questions of those with whom the petitioners lived.

During their time in Bangladesh, the petitioners allege that they suffered other harms as well, which they attributed to

General Ershad and his regime. These harms included alleged economic privation, based on, for example, the government's refusal to provide Rana Manzur with the benefits to which she believed she was entitled as a military officer's widow, obstruction of her employment opportunities, and the denial of a bank loan to start a business. These alleged harms also included, among other things, restrictions on travel, societal discrimination, the denial of medical care to Rubana Manzur, and several attempted rapes of Rana Manzur by an army officer who accompanied her and her daughter on a trip outside the country.

In December 1990, General Ershad was ousted from power and forced to resign by a democratic movement led in part by Begum Khaleda Zia, the widow of former President Zia. Khaleda Zia was elected Prime Minister of Bangladesh and assumed the office in March 1991. Between September 1990 and September 1991, all of the petitioners except for Rana Manzur left Bangladesh for the United States.

Rana Manzur remained in Bangladesh after General Ershad was ousted from power to investigate General Ershad's involvement in her husband's death and to pursue his prosecution for the execution of her husband. She was inspired by campaign statements made by Khaleda Zia while running for Prime Minister accusing General Ershad of the assassination of Khaleda Zia's husband, former President Zia, and stating that General Ershad should be

7

brought to justice.  Immediately after General Ershad resigned, Rana Manzur began speaking with lawyers about the possibility of prosecuting General Ershad and, after Khaleda Zia's election as Prime Minister, attempted to meet and speak with Prime Minister Zia on the subject.  Her efforts, however, were unsuccessful. Prime Minister Zia refused to meet with Rana Manzur, and the lawyers with whom Rana Manzur spoke refused to take the case, at least one of whom expressed fear for his safety.

In 1992, after Rana Manzur commenced her efforts to have General Ershad prosecuted, she began receiving threatening phone calls.  The calls became more frequent in 1993.  The calls normally came in the middle of the night.  The callers told her that they knew her every move, knew about her attempts to meet with Prime Minister Zia, and threatened that if she continued her efforts, she would suffer the same fate as her husband.  Apart from the threatening anonymous calls, Rana Manzur received one call from a Major Mizzan, a member of Prime Minister Zia's political party and a family friend, who advised her not to do "anything silly" and not to pursue the subject, because she should remember how her husband died.

Around this time, Rana Manzur was also visited on several occasions by the "anticorruption police," who asked her personal questions about her life, income, and children.  Further, after her absence from a military ceremony in 1993, she received calls

from the DGFI inquiring as to her absence and accusing her of trying to "conflict with the government."  Finally, in the fall of 1993, Rana Manzur observed an army jeep with what she perceived to be DGFI agents parked openly in front of her house for the first time.  After that, she abandoned her efforts to pursue General Ershad's prosecution, went into hiding, and began seeking a way to leave for the United States.  She entered the United States several months later, in January 1994, on a visitor's visa.

**B.**

The IJ held a series of hearings on the petitioners' applications for asylum and withholding of deportation.  The hearings commenced on July 22, 1997 and concluded with a final hearing in January 2000.  In a written decision dated January 31, 2002, the IJ denied the petitioners' applications, but granted the petitioners' requests for voluntary departure.

The IJ found that the petitioners had "failed to show that their experiences, whether considered singly or in the aggregate, establish persecution within the meaning of the [INA]."  While the IJ did not appear to question the credibility of the petitioners with respect to the individual incidents about which they testified and provided evidence, he analyzed each of the incidents and found that each incident did not support a finding of persecution.  He found, for example, that the petitioners' release

from confinement in 1981 "without harm" did not rise to the level of persecution or reveal action motivated by a desire to punish the petitioners based on a protected ground such as membership in a particular social group or political opinion.  He found that the petitioners' testimony about harassment by individuals they believed to be agents of the government of Bangladesh did not describe harm that rose to the level of persecution under the INA. The IJ rejected any claims of economic deprivation because the petitioners failed to establish that they were unable to support themselves, and because their economic conditions were more consistent with economic reality than with conspiratorial design. The IJ also found that the petitioners had not established that whatever threats they received constituted persecution or persecution on account of a protected ground.

On May 15, 2003, the BIA issued a separate order for each petitioner affirming without opinion the decision of the IJ. Thereafter, the petitioners filed this petition for review.

**II.**

To qualify for asylum, which is available at the Attorney General's discretion, an applicant bears the burden of establishing that the applicant is "unable or unwilling" to return to the applicant's native country because of persecution or a well-founded fear of persecution "on account of" a protected

ground: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158; see Edimo-Doualla v. Gonzales, 464 F.3d 276, 281 (2d Cir. 2006); Ramsameachire v. Ashcroft, 357 F.3d 169, 178 (2d Cir. 2004). While "persecution" is not defined in the INA, this Court has explained that

> persecution includes more than threats to life and freedom, and therefore encompasses a variety of forms of adverse treatment, including non-life-threatening violence and physical abuse, or non-physical forms of harm such as the deliberate imposition of a substantial economic disadvantage. In short, persecution is the infliction of suffering or harm upon those who differ on the basis of a protected statutory ground. . . .

Ivanishvili v. U.S. Dep't of Justice, 433 F.3d 332, 341 (2d Cir. 2006) (internal citations, alterations, and quotation marks omitted). A showing of past persecution on account of a protected ground triggers a rebuttable presumption that the applicant has a well-founded fear of future persecution on that ground. See Uwais v. U.S. Att'y Gen., 478 F.3d 513, 517 (2d Cir. 2007); Secaida-Rosales v. I.N.S., 331 F.3d 297, 306 (2d Cir. 2003).

In contrast to asylum, withholding of removal (formerly "withholding of deportation," see supra note 1, at 2) is nondiscretionary, but requires the applicant to satisfy the more stringent showing that "it is more likely than not" that the applicant's "'life or freedom would be threatened'" on account of one of the protected grounds if the applicant were returned to the applicant's native country. Ramsameachire, 357 F.3d at 178

11

(quoting 8 U.S.C. § 1231(b)(3)(A)); see Edimo-Doualla, 464 F.3d at 281; Yan Fang Zhang v. Gonzales, 452 F.3d 167, 172 (2d Cir. 2006). To obtain withholding of removal under the CAT, an applicant must show that it is more likely than not that the applicant would be tortured if removed. 8 C.F.R. § 208.16(c); see Edimo-Doualla, 464 F.3d at 281.

Where, as here, the BIA affirms the decision of the IJ without issuing an opinion, this Court reviews the decision of the IJ directly, as the final agency determination. See Twum v. I.N.S., 411 F.3d 54, 58 (2d Cir. 2005); Secaida-Rosales, 331 F.3d at 305; see also 8 C.F.R. § 1003.1(e)(4).

Legal questions, including mixed questions of law and fact and the application of law to fact, are reviewed de novo. See Poradisova v. Gonzales, 420 F.3d 70, 77 (2d Cir. 2005); Secaida-Rosales, 331 F.3d at 307. This Court reviews the IJ's factual findings under the substantial evidence standard; findings of fact are treated as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Zhou Yun Zhang v. U.S. I.N.S., 386 F.3d 66, 73 (2d Cir. 2004). An IJ's factual finding will be affirmed if it is "supported by evidence that is 'reasonable, substantial, and probative' when considered in light of the record as a whole." Jin Chen v. U.S. Dep't of Justice, 426 F.3d 104, 113 (2d Cir.

12

2005) (quoting Diallo v. I.N.S., 232 F.3d 279, 287 (2d Cir. 2000)).

Despite the deference typically afforded IJ and BIA decisions, this Court "require[s] a certain minimum level of analysis from the IJ and BIA opinions denying asylum, and indeed must require such if judicial review is to be meaningful." Poradisova, 420 F.3d at 77. Where the BIA has affirmed without issuing an opinion, our review is limited "'to the reasoning of the IJ, and we will not search the record independently for a basis to affirm the BIA.'" Jin Chen, 426 F.3d at 113 (quoting Secaida-Rosales, 331 F.3d at 305); see also Cao He Lin v. U.S. Dep't of Justice, 428 F.3d 391, 400 (2d Cir. 2005). "[T]he immigration court must adequately link its decision to the record evidence in a reasoned opinion that properly applies the law. . . ." Ivanishvili, 433 F.3d at 337.

This Court retains substantial authority to vacate and remand BIA and IJ decisions that result from flawed reasoning, a sufficiently flawed fact-finding process, or the application of improper legal standards. See Rizal v. Gonzales, 442 F.3d 84, 89 (2d Cir. 2006); Cao He Lin, 428 F.3d at 400-01, 406; see also Ivanishvili, 433 F.3d at 337. This Court also will not hesitate to vacate and remand where the BIA or IJ analysis is insufficient to determine whether the correct legal standard was applied. See Beskovic v. Gonzales, 467 F.3d 223, 224 (2d Cir. 2006); Mirzoyan

13

v. Gonzales, 457 F.3d 217, 221 (2d Cir. 2006) (per curiam). Such defects "are not excused by the fact that a hypothetical adjudicator, applying the law correctly, might also have denied the petition for asylum." Jin Shui Qiu v. Ashcroft, 329 F.3d 140, 149 (2d Cir. 2003). This Court "will vacate BIA conclusions, as to the existence or likelihood of persecution, that a perfectly reasonable fact-finder could have settled upon, insofar as the BIA either has not applied the law correctly, or has not supported its findings with record evidence." Id.

Finally, even if an IJ's decision contains errors, the decision will not be vacated and remanded if doing so would be futile. Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 339 (2d Cir. 2006). This Court will decline a remand as futile if we can "'confidently predict' that the agency would reach the same decision absent the errors that were made." Id. (quoting Cao He Lin, 428 F.3d at 395); see also Edimo-Doualla, 464 F.3d at 282.

**III.**

The IJ in this case found, among other things, that the petitioners failed to establish past persecution within the meaning of the Act. The IJ never made a specific adverse credibility determination. Instead, the IJ analyzed each of the petitioners' alleged incidents of persecution seriatim and disposed of each claim individually by concluding--for various

14

reasons--that the incidents did not constitute past persecution. Cf. Edimo-Doualla, 464 F.3d at 282. The IJ's finding that the petitioners failed to establish past persecution is deficient in several respects. The IJ's analysis is inadequate for us to determine whether he properly considered the petitioners' claims in the aggregate, and his individual analysis of several of the alleged incidents of harm contains both legal and factual errors. Because we cannot confidently predict whether the IJ would adhere to his decision absent these defects, we vacate the decision and remand the case for further consideration.

**A.**

The IJ's analysis is inadequate for this Court to determine whether the IJ properly considered in the aggregate the incidents of harm constituting the petitioners' claim of past persecution. While the IJ recited that he considered the petitioners' experiences both singly and in the aggregate, there is no reasoning in the decision that reflects that he did so. He considered each of the incidents separately without determining how they affected the significance of the other incidents. However, this Court has cautioned against precisely this sort of approach. See Poradisova, 420 F.3d at 79 ("Also troubling is the IJ's apparent (and erroneous) technique of addressing the severity

15

of each event in isolation, without considering its cumulative significance."); see also Edimo-Doualla, 464 F.3d at 283.

"Taking isolated incidents out of context may be misleading. The cumulative effect of the applicant's experience must be taken into account." Poradisova, 420 F.3d at 80 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva 1992)); see also Edimo-Doualla, 464 F.3d at 283 ("A series of incidents of mistreatment may together rise to the level of persecution even if each incident taken alone does not.").

The petitioners' claim of past persecution in this case is primarily predicated on the alleged pattern of harms to which the petitioners were subjected over approximately a twelve-year period in Bangladesh. This pattern of incidents is significant in at least two respects. First, accumulation of harm from the individual incidents may rise to the level necessary for persecution even though an individual incident may not. Second, "the motive for the harm inflicted must be analyzed in light of the context in which the harm occurred." Uwais, 478 F.3d at 517 (emphasis added). The pattern provides context for the petitioners' claims and may lend evidentiary support to a conclusion that individual incidents of harm were in fact "on

16

account of" a ground protected by the Act, such as political opinion or social group membership.

The IJ's practice of dividing this pattern of harms into isolated incidents and disposing of each on different grounds, without explaining the cumulative significance--if any--of each of these harms on the petitioners' aggregate claim of persecution, both misconstrues the nature of the petitioners' claim and deprives this Court of the opportunity to review meaningfully any aggregate analysis the IJ may have conducted. Thus, although the IJ stated that he considered the petitioners' claim both "singly" and "in the aggregate," there is no analysis in the decision that shows that the IJ correctly applied this standard.

**B.**

Apart from the IJ's apparent failure to consider adequately the petitioners' claim of past persecution in the aggregate, the IJ also erred in his individual analysis of several of the alleged incidents of harm.[3]

---

[3] Although we discuss the IJ's analysis of certain individual claims, the IJ should address and--if appropriate--consider, as part of his aggregate analysis, all of the events that the petitioners have alleged as contributing to their persecution. See supra at 7-8 (listing other alleged harms).

17

**1.**

First, the IJ erred in analyzing whether the petitioners' month-long confinement in 1981 was persecution on account of a protected ground. The IJ concluded, without further explanation, that the petitioners' "release from confinement in 1981 without harm does not [1] describe harm that rises to the level of persecution or [2] reveal action motivated by a desire to punish the [petitioners] on account of familial relationship, political beliefs or any political belief imputed to them." The IJ's conclusions are unsupported.

The meaning of the IJ's finding that the petitioners were released "without harm" is unclear, and to the degree that it means that their confinement did not support a finding of persecution, it is unfounded. If the IJ meant, somewhat trivially, that the petitioners suffered no harm at the moment of their release, the IJ failed to consider adequately the harm suffered during the petitioners' month-long confinement. The phrase "without harm" could also be a finding that the petitioners' month-long detention was not at all harmful. If so, the IJ's finding is not supported by substantial evidence. For example, the IJ did not appear to consider that the petitioners have been diagnosed with post-traumatic stress disorder based on their alleged persecution in Bangladesh, which includes their detention by authorities. Finally, "without harm" might refer to

18

the fact that the petitioners did not allege that they suffered physical harm during their month-long detention. If the IJ meant to suggest that a showing of physical harm is always required to demonstrate persecution, this conclusion was error. No such requirement has ever been established. See Ivanishvili, 433 F.3d at 341 ("[P]ersecution includes . . . non-life-threatening violence and physical abuse or non-physical forms of harm such as the deliberate imposition of a substantial economic disadvantage." (internal quotation marks, alterations, and citations omitted)).

Other than the statement that the petitioners were released "without harm," the IJ provided no further explanation for his finding that the petitioners' month-long confinement did not rise to the level of persecution. The IJ thus failed adequately to link his decision to the evidence in the record and in doing so deprived this Court of the opportunity to exercise any meaningful review of this finding.

The IJ also rejected the evidence of confinement as a factor in establishing a claim of past persecution because he found that there was no evidence that those responsible for the confinement sought to harm the petitioners "on account of familial relationship, political beliefs or any political belief imputed to them."

The IJ noted that "there is no persuasive evidence that those responsible [for General Manzur's death] sought to harm the

19

[petitioners] for his opinions." However, an asylum applicant can establish a persecutor's motives by either direct or circumstantial evidence. See I.N.S. v. Elias-Zacarias, 502 U.S. 478, 483 (1992); Uwais, 478 F.3d at 517.

In this case, the petitioners were detained without explanation immediately after General Manzur was taken away by military officers in the middle of the night and, as petitioners later learned, executed. The petitioners' relationship to General Manzur was no secret. Rana Manzur repeatedly asked about her husband throughout the family's detention. Furthermore, General Ershad and Colonel Awal, who took the petitioners into detention, were members of a political group that General Manzur had fought against. Indeed, there was evidence that General Ershad wanted to kill Rana Manzur and her children after the 1981 coup, but was dissuaded from doing so. At the very least, the IJ erred in apparently failing to consider this probative circumstantial evidence that the Manzurs were detained on account of General Manzur's political opinions that were imputed to them or because of their membership in a particular social group, defined by their familial relationship to General Manzur.[4] See Cao He Lin, 428

_____

[4] The IJ's decision appears to assume that "familial relationship" may be a protected ground for asylum purposes within the broader category of membership in a particular social group, but did not discuss this issue. See, e.g., In re A-M-E, 24 I. & N. Dec. 69, 73-74 (BIA Jan. 31, 2007) (discussing the standard for social group membership). We do not address whether familial relationship may constitute a "particular social group" under the INA, in light of the Supreme Court's determination that the BIA must decide this question in the first

F.3d at 400; Jin Shui Qiu, 329 F.3d at 149 (holding that all factual assertions in a claim must be considered unless the evidence is "too insignificant to merit discussion" (internal quotation marks omitted)).

The IJ also appears to have imposed an overly stringent burden of proof on the petitioners in analyzing whether the petitioners' month-long detention was on account of a protected ground. In considering this issue, the IJ speculated that because the petitioners' confinement occurred during the chaotic period following the assassination of President Zia, "their temporary confinement may have had purposes unrelated to any persecution on account of political views or family affiliation." However, "an asylum applicant need not show with absolute certainty why the events occurred, but rather, only that the harm was motivated, in part, by an actual or imputed protected ground." Uwais, 478 F.3d at 517; accord Osorio v. I.N.S., 18 F.3d 1017, 1028 (2d Cir. 1994). The IJ appears to have applied a stricter standard,

instance. Gonzales v. Thomas, 547 U.S. 183, 186–87 (2006) (per curiam); see also Ucelo-Gomez v. Gonzales, 464 F.3d 163, 170 (2d Cir. 2006) (per curiam) (noting that an individual IJ's interpretation, "even if summarily affirmed by the BIA, [is] not sufficient to constitute the agency's interpretation"). Nor do we address whether familial relationship may form the basis of an imputed political opinion, as several other courts of appeals have suggested. See, e.g., Dia v. Ashcroft, 353 F.3d 228, 255 (3d Cir. 2003) (en banc) (finding reasonable petitioner's conclusion that military officials raped his wife because of his alleged involvement with rebels); Navas v. I.N.S., 217 F.3d 646, 659 n.18 (9th Cir. 2000) ("Where police beat and threaten the spouse of a known dissident, it is logical, in the absence of evidence pointing to another motive, to conclude that they did so because of the spouse's presumed guilt by association.").

21

requiring the petitioners to disprove speculative alternative explanations and failing to recognize that asylum can be based on persecution that is motivated in part on a protected ground. This was legal error.

**2.**

The IJ also erred in his analysis of the petitioners' claim of persecution based on the constant surveillance to which the family was subjected after their release from detention. The IJ concluded that the petitioners' "alleged harassment by unknown individuals believed to be agents of the government does not describe harm that rises to the level of persecution under the Act." The only asserted basis for this conclusion was that "[t]here is no evidence in this record that any of the [petitioners] were ever arrested, detained or physically abused by the conduct described." This statement was plainly wrong because all of the petitioners had been detained for more than a month in 1981. Assuming that the IJ was referring solely to the subsequent surveillance, the IJ appears to have used an overly restrictive definition of persecution. There is no requirement that a petitioner claiming past persecution allege either detention or physical harm. See Ivanishvili, 433 F.3d at 341; see also Begzatowski v. I.N.S., 278 F.3d 665, 669 (7th Cir. 2002) ("Types of actions that might cross the line from harassment to

22

persecution include:  detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." (internal quotation marks omitted)), cited in Kyaw Zwar Tun v. U.S. I.N.S., 445 F.3d 554, 567 (2d Cir. 2006).

The IJ appears to have viewed skeptically the petitioners' claim that the individuals engaged in the surveillance were government agents, referring to them as "unknown individuals believed to be agents of the government."  The IJ did not, however, articulate this observation as an alternative basis for denying the petitioners' past persecution claim, and the IJ provided no basis for a conclusion that surveillance was being conducted by some non-governmental group.  As best we can tell, the IJ rejected this claim exclusively on the ground that it did not describe harm rising to the level of persecution.  Our review is limited to the reasoning of the IJ, and as to this claim, that reasoning was deficient.

**3.**

The IJ's analysis of petitioners' claim of past persecution based on the threats that Rana Manzur received in response to her efforts to have General Ershad prosecuted is also insufficient.

It is unclear whether the IJ rejected this claim because the petitioners did not identify the source of the threats or because

23

the petitioners did not demonstrate that the threats were "on account of" a protected ground. To the extent the decision rested on the former conclusion, it was legal error. The IJ cited a case from the Seventh Circuit Court of Appeals, Mitev v. I.N.S., 67 F.3d 1325 (7th Cir. 1995), for the proposition that "while threats could amount to persecution, an asylum applicant must identify who issued a particular threat, in what setting and for what purpose." In Mitev, however, the court was discussing the importance of the "context" of threats and specifically discounted threats that came from co-workers, often in the context of political discussions. Mitev, 67 F.3d at 1331. The court did not conclude that anonymous threats could not be included in the mix of evidence showing that an applicant had been subjected to persecution. As this Court has noted, "[c]oncluding that persecutors' failure to reveal their identities and motivations . . . undercuts an applicant's credibility does not rest on the 'legitimate nexus' required in credibility findings." Secaida-Rosales, 331 F.3d at 311; see also Poradisova, 420 F.3d at 80 ("The IJ also unreasonably dismissed as 'of no value' the anonymous threatening calls [the petitioner] Tatiana received in 1992 simply, and inexplicably, because they were anonymous.").

To the extent the IJ concluded that the death threats were not "on account of" a protected ground, the IJ failed to explain adequately the basis for this conclusion. Specifically, the IJ

24

did not explain the basis for his conclusion that Rana Manzur's attempts to have General Ershad prosecuted did not constitute the expression of a political opinion or cause a political opinion to be imputed to her. Here, Rana Manzur actively pursued General Ershad's prosecution after Prime Minister Zia, in her campaign, elevated the issue of bringing General Ershad to justice to the political stage. Rana Manzur testified that she began receiving threatening phone calls and visits from the anti-corruption police after she began pursuing General Ershad's prosecution, and that she was accused of "trying to conflict with" the government by the DGFI for not attending a military ceremony. The IJ asserted that the attempt to prosecute a public official, standing alone, is not sufficient to establish the expression of a political opinion.[5] The IJ also noted parenthetically that purely personal retribution is not persecution on account of political opinion.

This Court has rejected an "impoverished view of what political opinions are, especially in a country . . . where certain democratic rights have only a tenuous hold." Yueqing Zhang v. Gonzales, 426 F.3d 540, 546 (2d Cir. 2005) (quoting Osorio, 18 F.3d at 1030). In cases of opposition to government corruption, this Court has stated that the central questions for

---

[5] The IJ's statement that the attempt to prosecute a public official "standing alone" did not establish the expression of a political opinion is a further illustration of the IJ's general failure to evaluate adequately the petitioners' claims in light of the entire evidentiary context in which they arose.

25

determining the nature of an applicant's actions, which the IJ neither discussed nor recognized, are "whether the applicant's actions were directed toward a governing institution, or only against individuals whose corruption was aberrational" and "whether the persecutor was attempting to suppress a challenge to the governing institution." Id. at 548 (internal quotation marks and citation omitted); see also Hasan v. Ashcroft, 380 F.3d 1114, 1120 (9th Cir. 2004); Njuguna v. Ashcroft, 374 F.3d 765, 770 (9th Cir. 2004); Grava v. I.N.S., 205 F.3d 1177, 1181 (9th Cir. 2000) (finding that when alleged corruption which the petitioner exposed is inextricably intertwined with government operation, the exposure and prosecution of such abuse is necessarily political); Reyes-Guerrero v. I.N.S., 192 F.3d 1241, 1245-46 (9th Cir. 1999); Gomez-Saballos v. I.N.S., 79 F.3d 912, 917 (9th Cir. 1996) (finding that personal retaliation against a vocal political opponent does not render the opposition any less political, or the opponent any less deserving of asylum). In addition, this Court has stated that the determination of whether a petitioner's persecutors were motivated by the petitioner's opposition to the government "is a complex and contextual factual inquiry." Yueqing Zhang, 426 F.3d at 548. Because the IJ did not engage in this inquiry regarding the nature of Rana Manzur's actions or the motivation of her persecutors, the proper course is to remand for

further consideration of whether Rana Manzur made the requisite showing.

The IJ cited the Supreme Court's opinion in I.N.S. v. Elias-Zacarias, 502 U.S. 478 (1992), for the proposition that "[p]ersecution on account of political opinion means persecution on account of the victim's not the persecutor's political opinion." While that is a fair description of Elias-Zacarias, the citation misapprehends Rana Manzur's claim. Rana Manzur claims that she was persecuted precisely because of her political opinion that her husband had been the victim of assassination engineered by General Ershad and that, consequently, General Ershad should be prosecuted. She alleges that the threats were directed against her precisely because of her views, not the persecutors'. The IJ's analysis of this claim is, therefore, deficient.

The IJ also did not explain why, on these facts, the petitioners have not shown that the threatening calls that Rana Manzur received were motivated--at least in part--by an imputed political opinion. This Court has stated that, under a theory of imputed political opinion, an applicant may establish persecution "on account of" a protected ground by showing that the persecutors perceived the applicant to have a political opinion and acted because of it. See Chun Gao v. Gonzales, 424 F.3d 122, 129 (2d Cir. 2005).

27

**4.**

Finally, the IJ's analysis of the petitioners' economic persecution claim is insufficient to determine whether the correct legal standard was applied. See Beskovic, 467 F.3d at 224. The IJ rejected petitioners' claim of economic persecution because he concluded that they "failed to establish . . . that they were not able to support themselves," citing as support several cases that do not articulate a clear standard for economic persecution. This Court has previously recognized that the standard for economic persecution claims is unclear, and remanded to the BIA for clarification. See Mirzoyan, 457 F.3d at 223-24.

The BIA's recent decision, In re T-Z-, 24 I. & N. Dec. 163 (BIA May 9, 2007), responds to this Court's request in Mirzoyan and articulates the BIA's standard for evaluating nonphysical harm, including economic harm. Based on this intervening decision, and because we are unable to determine the standard that the IJ applied to petitioners' claim of economic persecution, the proper course is to remand to the BIA for further consideration in light of In re T-Z-.

**IV.**

For all of these reasons, the Court concludes that the IJ erred in considering the petitioners' claim of past persecution. Assuming that the petitioners can establish their claim of past

28

persecution, the Government on remand will have to overcome a rebuttable presumption that the petitioners have a well-founded fear of future persecution.[6]  Therefore, because we cannot confidently predict whether, under these circumstances and absent the IJ's errors, the BIA would adhere to its prior decision

---

[6] The IJ did not discuss the issue of whether the petitioners have a well-founded fear of future persecution other than to conclude that the petitioners had "not established" that "any harm . . . feared was on account of any characteristic enumerated in the Act."  The IJ never analyzed or even mentioned whether the Government offered sufficient evidence to overcome any presumption that the petitioners had a well-founded fear of future persecution as a result of their past persecution.

The IJ did, however, cite to a July 27, 1998 letter from the State Department Office of Asylum Affairs, submitted in response to the IJ's request for an advisory opinion on Rana Manzur's asylum application. Letter from William M. Bartlett, Director, Office of Asylum Affairs, Bureau of Democracy, Human Rights and Labor, United States Department of State, to Executive Office of Immigration Review, Office of the Immigration Judge (July 27, 1998) [hereinafter Letter].  The letter summarizes some of the petitioner's claims and then concludes that "[i]t seems unlikely that the applicant would face any mistreatment in Bangladesh if she were to return to that country."  Id. at 2.

It is not clear to what extent the IJ relied on this letter in concluding that the petitioners failed to establish their claim of past persecution, and in any event, the letter cannot cure the IJ's failure to analyze adequately the petitioners' claim of past persecution. Moreover, it is unclear what weight the IJ gave to the letter in assessing whether the Manzurs have a well-founded fear of future persecution; we reject the Government's contention that its position in the letter is in any way dispositive of the issue of future persecution, particularly given the IJ's failure to assess the applicable burden of proof.  The letter is no substitute for the IJ considering the full record of testimony and evidence in this case, cf. Tian-Yong Chen v. U.S. I.N.S., 359 F.3d 121, 130 (2d Cir. 2004) (cautioning against excessive reliance on State Department country reports), particularly when the letter relies solely on analysis of country conditions and the written asylum application and disclaims any independent investigation into the pattern of events that petitioners allege constitute past persecution.  See Letter at 2.  The letter in this case also contains certain factual misstatements.  See id. at 1 (claiming that petitioner "does not claim to have been . . . detained" despite the Manzurs' claim of month-long confinement); id. (claiming that President Zia was the father, rather than the husband, of Prime Minister Khaleda Zia).

29

denying the petitioners' applications for asylum, we remand.  <u>See</u> <u>Uwais</u>, 478 F.3d at 519 n.1; <u>Beskovic</u>, 467 F.3d at 227;

Because the errors in the IJ's analysis of the petitioners' claim for asylum bear on the petitioners' eligibility for withholding of deportation (or removal) under the INA and relief under the CAT, we remand these latter claims as well.  <u>See, e.g.,</u> <u>Abankwah v. I.N.S.</u>, 185 F.3d 18, 26 (2d Cir. 1999).

## <u>CONCLUSION</u>

For all of the reasons discussed above, the petition for review is **GRANTED**.  The decision of the BIA is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this opinion.