06-3285-ag
Gao v. U.S. Att'y Gen.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Submitted: July 13, 2007                                Decided:  September 4, 2007)

Docket No. 06-3285-ag

_____

XU SHENG GAO,

Petitioner,

v.

UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Before: POOLER, PARKER, and WESLEY, Circuit Judges.

_____

Petition for review of an order of the Board of Immigration Appeals affirming the

Immigration Judge's decision finding petitioner statutorily ineligible for asylum or withholding

of removal on the basis of the persecutor bar.  Petition granted; order vacated and remanded.

Gang Zhou, New York, NY, for Petitioner.

Benjamin H. White, Jr., First Assistant United States
Attorney, for Anna Mills Wagoner, United States Attorney
for the Middle District of North Carolina, Greensboro, NC,
for Respondent.

_____

1

POOLER, Circuit Judge:

Petitioner Xu Sheng Gao seeks review of the June 30, 2006, order of the Board of Immigration Appeals ("BIA") adopting and affirming Immigration Judge ("IJ") Paul A. DeFonzo's February 3, 2005, decision finding Gao statutorily ineligible for asylum or withholding of removal on the basis of the persecutor bar in 8 U.S.C. § 1158(b)(2)(A)(i) and 8 U.S.C. § 1231(b)(3)(B)(i). See In re Gao, No. A. 95 172 158 (B.I.A. June 30, 2006), aff'g No. A. 95 172 158 (Immig. Ct. N.Y. City Feb. 3, 2005). We previously granted Gao's motion seeking expedited review. On July 16, 2007, we issued an order announcing our disposition in this case. As we stated in that order, the petition for review is granted, the order of the BIA is vacated, and the matter is remanded to the agency for further proceedings consistent with this opinion. We now explain the basis of our decision and hold that the IJ erred in concluding that Gao was statutorily barred from obtaining asylum or withholding of removal on the basis that he had "assisted" in the persecution of others.[1]

## BACKGROUND

Gao is a native and citizen of China. He entered the United States on March 11, 2001, as a non-immigrant B1 visitor. [JA 484] On December 10, 2001, Gao filed an affirmative application for asylum and withholding of removal on the basis that he had been persecuted in China on account of his political opinion. [JA 379-88] Gao was subsequently interviewed by an asylum officer, who determined that Gao was "barred by statute from a grant of asylum" because evidence indicated that he had "ordered, incited, assisted, or otherwise participated in the

---

[1]We grant the pending motion seeking "disregard of petitioner's personal missive" for the reasons stated in the attorney affidavit supporting the motion.

2

persecution of others . . . ." [JA 260]. The matter was therefore referred to an immigration judge.

On November 16, 2003, the government filed a motion to pretermit Gao's asylum application on the basis that he was a persecutor under Section 208(b)(2)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(2)(A)(i). [JA 468-72] On February 3, 2005, Gao had a hearing before the IJ in which he testified as follows. From February 1997 to October 2000, Gao was the chief officer of the Quingdao City Culture Management Bureau. [JA 120-21, 126] Gao supervised approximately 35 inspectors who were assigned to different districts. [JA 122] Gao's Bureau was responsible for inspecting bookstores to determine if they were selling any prohibited materials. [JA 120] Prohibited materials were items that were banned by the Chinese government's cultural laws, such as works that violated copyright laws, works containing sexual content, and works of a "politically sensitive" nature. [JA 154] Every year, Gao and his inspectors would receive a list from the Quingdao City Culture Management Administrative Office that contained the titles of each prohibited item. [JA 123] If prohibited materials were found, the inspectors would confiscate the items and issue a violation certificate. [Id.] Gao's Bureau did not have authority to impose any sanction beyond confiscating the prohibited materials and issuing citations. [JA 125] When they encountered a serious case, which occurred when either the seller was a repeat offender or had more than 50 prohibited items, Gao would report the matter to the Vice President of his Bureau, who would then determine whether the matter should be referred to the Industrial and Commercial Management Bureau. [Id.] The Industrial and Commercial Bureau would then decide whether to impose a sanction such as levying a fine or cancelling the seller's business license. [Id.] Gao stated that based on his

3

knowledge of Chinese law, he was aware that the most serious sanction that a violator could receive was a sentence of 10 years in prison, but during his time with the Bureau, he did not know of anyone who had been arrested or jailed. [JA 125-26, 156, 159-60] The most severe penalty that occurred during his tenure with the Bureau was the revocation of an owner's business license. [JA 159-60] However, the possibility existed that a serious matter could be referred to the Public Security Bureau, which did have the authority to make arrests and pursue criminal charges against a violator. [JA 165] Gao did not have any input in such decisions, and his authority ceased once the matter had been referred to the Vice President of his Bureau. [JA 125]

As part of his job, Gao would on occasion personally conduct inspections of bookstores. [JA 127] This occurred at least once a month. [Id.] During these inspections, bookstore owners would sometimes give books to Gao to have him assess whether they were prohibited. [JA 126-28] Gao started reading some of these books, including books about democracy, Western culture, and works that were critical of the Chinese government. [JA 128-29] In these cases, Gao would not report the violations and would not confiscate the books. [JA 129-30] He also began giving these books to his friends to read. [JA 129-30] Gao testified that although he was concerned that he himself was violating the regulations, he believed these were important books and the Chinese people should be told about what their government was doing. [JA 130-31]

Generally, when Gao conducted inspections, he went by himself. On one occasion, however, on October 3, 2000, he conducted an inspection with two other inspectors. [JA 131-32] During this inspection, he found a book entitled The Prince Party of China, which was a prohibited book that he had previously read. [JA 132-33; 171-72] Gao told the owner to get rid of

4

the book, but he did not confiscate it because he had changed his attitude toward these types of books and now believed that they should be sold. [JA 133-34] Although Gao thought his actions went unnoticed by the two inspectors who had accompanied him, a few days later, his supervisor came to him and told him that he had violated the rules by failing to detect and confiscate a prohibited item. [JA 134-35] Gao was temporarily suspended from his duties by his supervisor. [JA 135-36] Then, on October 12, 2000, two police officers came and took Gao to the Public Security Bureau for questioning. [JA 136] Gao testified that they confronted him about his failure to confiscate the book on October 3rd, which he denied. [JA 137] The police officers then began beating him with their batons in order to force him to admit that he was working with the book sellers to sell prohibited materials. [JA 137] Gao was ultimately detained fifteen days before he was released. [JA 139] The officers released him so that he could obtain medical treatment for the injuries caused by the beating, but told him he would have to report to the police station every week. [JA 140] Soon after he was released, Gao received notice that he had been fired from his job because he had violated the rules and assisted book sellers in distributing prohibited materials. [JA 144]

Gao reported to the police station as instructed twice, but then learned that the police planned to bring criminal charges against him. [JA 142-43] He therefore fled China and came to the United States. [Id.] While in the United States, Gao has learned from his wife that police have repeatedly come to his house looking for him because had failed to report to the police station as required. [JA 145]

At the conclusion of the hearing, the IJ rendered his oral decision. The IJ first made an "overall positive credibility" finding with regard to Gao's testimony. [JA 47] The IJ further

5

found that Gao "possesses a well-founded fear of persecution should he be compelled to return to China" and "has also demonstrated by a clear probability of the evidence that he would be subjected to persecution should he be compelled to return to China." [JA 48] Nevertheless, the IJ denied Gao's applications for asylum and withholding of removal because he concluded that Gao was a "persecutor" within the meaning of the refugee statute due to his prior work with the Culture Management Bureau. The IJ determined that "any arrests or penalties imposed upon individuals violating the precepts of the Communist Party in China had to be effected with the activity and acquiescence of the respondent and the management bureau of which he was the administrator." [JA 50] Therefore, the IJ found that Gao's activities "were the direct link between the dissemination of materials deemed prohibited by the Chinese government and the enforcement or the application of sanctions by the various organs of the Chinese government." [JA 50] The IJ further cited the State Department Country Report on China, which indicated that the Chinese government was responsible for "rampant human rights abuses" and "maintains tight restrictions on freedom of speech and of the press." [JA 50] In particular, the Country Report showed that China has "cracked down on printing houses and the publishing of books which the government considers to be politically sensitive." [JA 51] From this, the IJ concluded that Gao's "role in the pattern and practice of persecution of publishers, journalists, and book sellers is integral to the ability of the Chinese government to persecute those individuals." [JA 51] On June 30, 2006, the BIA adopted and affirmed the IJ's decision without further explanation.[2] [JA 2]

---

[2]The government failed to file a timely brief before the BIA, and the Board rejected the government's untimely submission. [JA 3] Thus, to the extent the government disputed the IJ's positive credibility finding or his determination that Gao had otherwise demonstrated eligibility for asylum and withholding of removal, it waived its right to present such arguments.

6

On July 13, 2006, Gao timely filed a petition for review in this court. While the petition was pending, Gao was taken into custody by immigration officials and placed in a detention center. On June 7, 2007, this court granted Gao's motion to expedite review based on his attorney's affidavit stating that Gao's physical and mental health had severely deteriorated while in immigration custody such that he had become suicidal. The case was placed on the court's calendar for July 13, 2007, and in light of the expedited nature of the proceedings, we issued an order on July 16, 2007, indicating our disposition of the matter. We now explain the basis of our decision.

## DISCUSSION

Asylum is available to an individual who establishes that he or she is a refugee under Section 101(a)(42) of the INA, 8 U.S.C. § 1101(a)(42). See 8 U.S.C. §1158(b)(1)(A). Refugees are persons who are unable or unwilling to return to their native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Similarly, withholding of removal is available to any person whose "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Both forms of relief, however, specifically exclude individuals who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(2)(A)(i); see also 8 U.S.C. § 1231(b)(3)(B)(i). The definition of refugee also explicitly exempts "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality,

7

membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). These provisions are known as the "persecutor bar," and render an applicant statutorily ineligible for either asylum or withholding of removal even if the applicant can otherwise satisfy the requirements for obtaining those forms of relief.

In this case, the IJ found that Gao had satisfied his burden of demonstrating a well-founded fear of persecution on account of political opinion as required under the asylum statute, as well as a clear probability that his life or freedom would be threatened if returned to China as required for withholding of removal. Both forms of relief were denied solely on the basis of the persecutor bar. Because the BIA adopted and affirmed the IJ's decision without adding any further explanation, we review the IJ's decision directly. See Ming Xia Chen v. BIA, 435 F.3d 141, 144 (2d Cir. 2006). We review de novo the IJ's legal conclusion that the tasks performed by Gao rendered him a "persecutor" under the statute. See Khouzam v. Ashcroft, 361 F.3d 161, 165 (2d Cir. 2004) ("The BIA's application of law to undisputed facts is reviewed de novo."); cf. Mirzoyan v. Gonzales, 457 F.3d 217, 220 (2d Cir. 2006) (per curiam) (determination of whether the facts meet the legal definition of persecution "is a mixed question of law and fact, which we review de novo"). We review the underlying factual findings supporting this conclusion under the substantial evidence standard, upholding them if they are supported by "reasonable, substantial, and probative evidence in the record when considered as a whole." Secaida-Rosales v. INS, 331 F.3d 297, 307 (2d Cir. 2003) (internal quotation marks omitted); see also 8 U.S.C. § 1252(b)(4)(B). An applicant bears the burden of demonstrating that he or she has satisfied the requirements for asylum or withholding of removal. See 8 U.S.C. § 1158(b)(1)(B); 8 U.S.C. § 1231(b)(3)(C). "If the evidence indicates that one or more of the grounds for mandatory denial

8

of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1240.8(d).

In this case, there is no evidence that Gao ordered, incited, or participated in any act of persecution. Thus, the question before this court is whether the IJ correctly concluded that Gao, through his actions as an inspector with the Culture Management Bureau, "assisted" in the persecution of others. We hold that the record does not support this conclusion.

In evaluating a persecutor bar claim, it must be remembered that this provision authorizes the deportation of individuals who have established that they would likely be persecuted if sent back to their native country. Thus, courts must be cautious before permitting generalities or attenuated links to constitute "assistance." In this case, the IJ properly focused his analysis on the fact that the Chinese cultural laws that Gao's Bureau enforced permitted the arrest and imprisonment of book store owners who distributed "politically sensitive" materials. As the IJ recognized, the arrest and detention of individuals for selling books containing politically disfavored views can constitute persecution on account of political opinion. See Tian-Yong Chen v. INS, 359 F.3d 121, 128 (2d Cir. 2004) (noting that the term persecution "includes 'more than threats to life or freedom'") (quoting Begzatowski v. INS, 278 F.3d 665, 669 (7th Cir. 2002) (noting that types of actions that might constitute persecution include "detention, arrest, interrogation, prosecution, [and] imprisonment" (internal quotation marks omitted))); cf. Manzur v. U.S. Dep't of Homeland Sec., --- F.3d ---, 2007 WL 2028135, at *7 (2d Cir. July 16, 2007) (IJ erred in failing to adequately explain why petitioners' month-long confinement for their political views did not amount to persecution).

However, the mere fact that Gao may be associated with an enterprise that engages in

9

persecution is insufficient by itself to trigger the effects of the persecutor bar. As the Supreme

Court's oft-quoted dicta in Fedorenko v. United States, 449 U.S. 490 (1981), illustrates, a "guilt

by association" approach to the persecutor bar is improper:

> [A]n individual who did no more than cut the hair of female inmates [in
> concentration camps] before they were executed cannot be found to have assisted
> in the persecution of civilians. On the other hand, there can be no question that a
> guard who was issued a uniform and armed with a rifle and a pistol, who was paid
> a stipend and was regularly allowed to leave the concentration camp to visit a
> nearby village, and who admitted to shooting at escaping inmates on orders from
> the commandant of the camp, fits within the statutory language about persons who
> assisted in the persecution of civilians. Other cases may present more difficult
> line-drawing problems but we need decide only this case.

Id. at 512 n.34; see also Maikovskis v. INS, 773 F.2d 435, 446 (2d Cir. 1985) ("We do not mean

to suggest . . . that an alien's inactive membership in an organization bent on politically-based

persecution or that his tangential provision of services to such an organization would suffice to

show that the alien assisted or otherwise participated in such persecution . . . ."); In re Rodriguez-

Majano, 19 I. & N. Dec. 811, 814-15 (B.I.A. 1988) ("[M]ere membership in an organization,

even one which engages in persecution, is not sufficient to bar one from relief, but only if one's

action or inaction furthers that persecution in some way.").

We have used this dicta from Fedorenko as a guide in evaluating whether an individual

had "assisted" in acts of persecution. See Zhang Jian Xie v. INS, 434 F.3d 136, 141-42 (2d Cir.

2006); United States v. Reimer, 356 F.3d 456, 459-60 (2d Cir. 2004); Maikovskis, 773 F.2d at

446; United States v. Sprogis, 763 F.2d 115, 121 (2d Cir. 1985); see also Miranda Alvarado v.

Gonzales, 449 F.3d 915, 925 (9th Cir. 2006) (noting that the Supreme Court's "somewhat cryptic

footnote" in Fedorenko "has since become the principal guide to interpreting persecutor

exceptions generally"). In Xie, this court's most recent and detailed discussion of the persecutor

10

bar, we observed that when determining whether an individual's actions constituted assistance in persecution, our prior cases "looked not to the voluntariness of the person's actions, but to his behavior as a whole. Where the conduct was active and had direct consequences for the victims, we concluded that it was 'assistance in persecution.' Where the conduct was tangential to the acts of oppression and passive in nature, however, we declined to hold that it amounted to such assistance." 434 F.3d at 142-43. Applying these principles, we then examined whether Xie, who had worked as a driver for the Changle County Department of Health in China's Fujian Province, had "assisted" in persecution within the meaning of the INA. Although most of Xie's tasks were mundane, he had on occasion "transported pregnant women to hospitals in the locked back of a van, against their will, so that county officials could perform forced abortions on them pursuant to China's mandatory family planning policies." Id. at 138. We found that Xie's action "contributed directly to the persecution" because "[b]y driving the van in which the women were locked, Xie ensured that they were delivered to the place of their persecution: the hospitals where their forced abortions took place." Id. at 143. Thus, we concluded that Xie had "played an active and direct, if arguably minor, role" in carrying out acts of persecution, and accordingly, the IJ had properly determined that Xie was ineligible for relief under the persecutor bar. Id.

The government contends that the IJ's decision here fits squarely within the holding of Xie. We disagree for several reasons. First, this case raises a preliminary issue not addressed by the court in Xie. Before we can determine whether Gao's conduct "contributed directly" to persecution, or if instead his conduct was "tangential" to the acts of persecution, the record must first reveal an identifiable act of persecution in which Gao allegedly assisted. This was not an issue in Xie because the acts of persecution in which Xie allegedly assisted were clear. Xie

11

testified to specific incidents in which he had driven women to family planning clinics, against their will, where involuntary abortions were then performed on them. Id. at 138. The question in Xie was whether Xie's role as a driver was sufficient to constitute assistance in these identified acts of persecution. Contrary to Xie, however, the record in this case does not disclose any actual act of persecution in which Gao allegedly assisted. Gao's testimony, which the IJ found credible, only indicates Gao's awareness that under the law, one could be arrested or imprisoned for serious violations of the cultural laws. There is no evidence in the record that any book seller Gao or his inspectors cited for violating the cultural laws was ever arrested, detained, charged, prosecuted, or imprisoned for selling prohibited materials. Gao specifically testified that to his knowledge, the most serious sanction that had been imposed on a book seller during his time with the Bureau was the revocation of a business license. [JA 159-60] Before Gao may be held personally accountable for assisting in acts of persecution, there must be some evidence that he himself engaged in conduct that assisted in the persecution of another.[3] That evidence must further show that the alleged act of persecution occurred *on account of* one of the protected

_____

[3]We note that the record contains testimony from the asylum officer who first interviewed Gao and drafted the assessment memo. The officer testified that he "got the impression" that arrests and imprisonment occurred while Gao worked at the Bureau. [JA 186] He further testified that he assumed Gao's inspectors were the ones who arrested people. [JA 188-89] He acknowledged, however, that he never asked Gao if he arrested anyone and he had no recollection of Gao ever stating that his inspectors had arrested people. [JA 189] Nevertheless, the asylum officer stated that he would "interpret" his notes as meaning that Gao's inspectors were the ones "arresting people, detaining people, and fining people." [JA 190] The IJ noted that the asylum officer's testimony and his assessment memo created an ambiguity regarding Gao's precise activities at the Bureau, but the IJ resolved this dispute in favor of Gao, crediting his testimony that his Bureau had no authority to make arrests and noting that Gao categorically denied the asylum officer's version of the interview. [JA 47] The government has not challenged this finding, see supra n.2, nor does it attempt to rely on the asylum officer's testimony in its brief to this court. Accordingly, we too give no weight to the asylum officer's testimony in deciding this appeal.

12

grounds: race, religion, nationality, membership in a particular social group, or political opinion.

On this point, we agree with the analysis set forth by the Seventh Circuit in Singh v. Gonzales, 417 F.3d 736, 739-40 (7th Cir. 2005). In determining whether a local police officer with the Punjabi police department in India had assisted in persecution, the court noted that the body of case law involving individuals who had worked in Nazi concentration camps was not "fully compatible with the present statutory and factual situation" because "[u]nlike Nazi concentration camps, whose complete existence was premised upon the persecution of innocent civilians, local Punjabi police departments served traditional, legitimate law enforcement purposes and did not exclusively engage in the persecution of innocent Sikhs." Id. at 739. Thus, in these instances of "line-drawing," courts must take care to distinguish between "genuine assistance in persecution and inconsequential association with persecutors." Id. "In other words, simply being a member of a local Punjabi police department during the pertinent period of persecution is not enough to trigger the statutory prohibitions on asylum and withholding of removal. Rather, for the statutory bars . . . to apply, the record must reveal that the alien actually assisted or otherwise participated in the persecution of another . . . ." Id. at 739-40 (emphasis in original).

Like the Punjabi police department, the Culture Management Bureau does not exist solely to persecute individuals for distributing politically disfavored materials, but also performs legitimate tasks such as enforcing copyright and pornography laws. Therefore, even though the State Department Country Report indicates that the Chinese government is an "authoritarian state" that has engaged in "numerous human rights abuses" and "maintain[s] tight restrictions on freedom of speech and of the press" [JA 203, 204], this is insufficient on its own to trigger the

13

persecutor bar without evidence indicating that Gao <u>actually</u> assisted in an identified act of persecution. The record contains no evidence that any such act of persecution occurred in connection with Gao's activities with the Culture Management Bureau. Consequently, there is no evidentiary support for the IJ's determination that Gao's activities had a "direct link" to acts of persecution. Nor is there any basis from which the IJ could conclude that Gao's actions had "direct consequences for . . . victims" of persecution. <u>Xie</u>, 434 F.3d at 143.

Furthermore, the IJ's statement that "any arrests or penalties imposed upon individuals violating the precepts of the Communist Party in China had to be effected with the activity and acquiescence of the respondent and the management bureau of which he was the administrator" [JA 50] is neither an accurate statement of the record nor sufficient to invoke the persecutor bar. Without evidence that an individual inspected by Gao's Bureau had been persecuted for violating the cultural laws, it cannot be said that "arrests or penalties" were imposed on individuals "with the activity and acquiescence" of Gao. In addition, the only "activity" Gao performed that could have allegedly assisted in persecution was to issue a report to his supervisor when he or his inspectors encountered a "serious" violation of the cultural laws. [JA 124-25] The link between this action and the potential arrest or imprisonment of any individual is too attenuated to sustain a finding that Gao had assisted in persecution. Numerous steps had to occur before an arrest could potentially occur, and neither Gao nor his Bureau had any input, knowledge, or control in such decisions. While Gao could issue a report to his supervisor, his supervisor also lacked authority to arrest or detain any individual. Instead, the supervisor, in his or her discretion, would then determine if the matter was serious enough to refer further to the Industrial and Commercial Management Bureau. [JA 125] While the Industrial and Commercial Management Bureau could

14

decide, in its discretion and without the input or knowledge of Gao, to impose fines and revoke

business licenses [JA 125, 165], it too had no authority to effectuate arrests. An arrest could only

occur if someone—outside Gao's Bureau and without his input or knowledge—made the

determination to refer the matter to the Public Security Bureau. [JA165] Gao's authority ceased

once the matter was reported to his supervisor. [JA 125, 164-65] Moreover, it was entirely

within the discretion of others beyond Gao's control and knowledge whether the matter would

even reach the Public Security Bureau, and the report passed across several desks before reaching

the stage where arrest or imprisonment were possible. Finally, at each point in the process, a

discretionary decision had to be made as to whether the matter would proceed further, and Gao

had no involvement beyond his initial decision to issue a report. Under these circumstances, we

cannot conclude that the act of issuing a report that could potentially be used to arrest an

individual is sufficient to constitute a "direct link" to persecution.

Similarly, the IJ's reliance on the portion of the State Department Report indicating that

the "Chinese government has cracked down on printing houses and the publishing of books

which the government considers to be politically sensitive" [JA 51] also provides little support

for the conclusion that Gao assisted in acts of persecution. While the Country Report indicates

that the Chinese government has imposed harsh sanctions against publishers that print politically

disfavored content, there is nothing in the record indicating that Gao's actions as an inspector of

bookstores assisted in the persecution of printing houses. There is no evidence that shows, or

even suggests, that any publishers were persecuted as a resu lt of Gao's actions. While there is

no question that political dissidents can face harsh treatment in China [JA 219-25], the record

must contain some evidence connecting Gao's specific actions to those acts of persecution before

15

he can be labeled a "persecutor."

Finally, on this record, we are also unable to conclude that Gao had the requisite level of knowledge that his acts assisted in persecution to sustain a finding that he was a "persecutor" under the statute. Our sister circuit recently considered the issue of whether the persecutor bar in the INA contains a scienter element. See Castañeda-Castillo v. Gonzales, 488 F.3d 17, 20-22 (1st Cir. 2007) (in banc). The petitioner in that case, while serving in the Peruvian military, had participated in a raid on a village that resulted in the brutal massacre of civilians. Id. at 19. His patrol never entered the village, but instead was tasked with blocking escape routes out of the village. Id. There was no dispute that Castañeda-Castillo's acts, if committed with knowledge of the massacre of innocent civilians, constituted assistance in persecution under the refugee statute. Id. at 20. Castañeda-Castillo claimed, however, that he had no knowledge that the raid would involve the murder of civilians, he had been told that the purpose of the raid was to arrest members of the Shining Path group, and he did not learn the true nature of the raid until weeks later. Id. at 19. The IJ and BIA denied Castañeda-Castillo's application for asylum based on the persecutor bar, agreeing with the government's position that Castañeda-Castillo's state of mind was irrelevant so long as the "objective effect" of his actions assisted in persecution. Id. at 20. The First Circuit, sitting in banc, rejected this view in a unanimous decision:

> We hold that presumptively the persecutor bar should be read not to apply to Castañeda if his version of his state of mind is accepted. On remand the agency can, if it wants, try to develop a construction more favorable to the government. But this would have to be done expressly and persuasively, and not by vague reference to the 'totality of ... conduct' that conflates the question whether one's conduct constitutes 'assistance' with the question whether one possessed such scienter as may be required under the circumstances.

Id. at 22 (emphasis in original). The court further noted, however, that cases of "willful

16

blindness or strong suspicions, or an abettor who knows generally of a pattern of persecution while being ignorant of specific incidents" could constitute "gray-area cases where less than full and detailed knowledge may suffice." Id. at 21. In addition, because of the statutory scheme in place, see 8 C.F.R. § 1240.8(d),[4] once the government has satisfied its initial burden of demonstrating that the persecutor bar applies, the burden would then shift to the applicant to disprove knowledge. See Castañeda-Castillo, 488 F.3d at 21.

While the evidence need not show that the alleged persecutor had specific actual knowledge that his actions assisted in a particular act of persecution, we find persuasive the First Circuit's view that the persecutor bar requires some level of culpable knowledge that the consequences of one's actions would assist in acts of persecution. Otherwise, the statute would sweep in every individual who unwittingly commits an act, no matter how minor, that unbeknownst to them provided direct assistance to a persecutor's scheme. See id. at 20 ("[T]he bus driver who unwittingly ferries a killer to the site of a massacre can hardly be labeled a 'persecutor,' even if the objective effect of his actions was to aid the killer's secret plan."). Whether Gao's claimed lack of knowledge was a product of his willful blindness or whether Gao's mere awareness of the potential penalties one could face under the Chinese cultural laws provides the requisite level of knowledge, are questions best addressed by the agency in the first instance. But some analysis of this element is required before we can sustain a finding that an individual "assisted . . . in the persecution of others" under the persecutor bar.

---

[4]We note that the First Circuit relied on the burden of proof provision in 8 C.F.R. § 1208.13(c)(2)(ii), which applies to asylum applications filed before April 1, 1997, as Castañeda-Castillo's had been. Because Gao's application was filed after this date, his case is governed by 8 C.F.R. § 1240.8(d), which contains similar language with respect to the proper burden of proof in cases involving the persecutor bar.

**CONCLUSION**

For the foregoing reasons, the petition for review is granted, the order of the BIA is vacated, and the matter is remanded to the agency for further proceedings consistent with this opinion. Because the BIA's order is vacated, the pending motion to stay the order of removal is denied as moot.